IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HAB CARRIERS, INC., ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> ARROW TRUCK SALES, INC., MACK ) <br> TRUCKS, INC., SCOTT TAYLOR, and RICK ) <br> MOORE, ) <br> ) <br> Defendants. ) | Case No. 09 C 5200 <br><br> Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Plaintiff HAB Carriers, Inc. ("HAB") sued Arrow Truck Sales, Inc. ("Arrow"), Arrow employees Scott Taylor ("Taylor") and Rick Moore ("Moore") (collectively "the Arrow Defendants"), and Mack Trucks, Inc. ("Mack")[1] in the Circuit Court of Cook County, Illinois over a dispute regarding the sale of twenty Mack trucks. Specifically, HAB alleges that: (1) the Arrow Defendants committed common law fraud (Count I); (2) the Arrow Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("the Consumer Fraud Act" or "the Act") (Count II); (3) Arrow breached its contract with HAB (Count III); (4) Arrow breached its warranty (Count IV); (5) Arrow and Mack breached their warranty (Count V); and (6) Mack breached a third-party beneficiary contract (Count VI). Having removed the case to this Court, the Arrow Defendants move for summary judgment solely on Count II claiming that the alleged fraud did not occur primarily and substantially in the State of Illinois. Other motions for summary judgment on other grounds are currently pending and under consideration by the Court. Because the Court finds that

---

[1] HAB also sued National Truck Protection Company, Inc. ("National Truck"), but has since dismissed National Truck from this case.

the alleged fraud did not primarily and substantially occur in Illinois, the Arrow Defendants' Motion is granted.

## STATEMENT OF FACTS[2]

HAB, a for-hire motor carrier, is a corporation organized under Illinois law with its principal place of business in Willow Springs, Illinois. (Pl. 56.1 Resp. ¶ 1; Compl ¶ 1.) Arrow, a company that sells used trucks, is a Missouri corporation registered as a foreign corporation in Illinois. (Def. 56.1 Resp. ¶ 13; Compl. ¶ 2.) From approximately February of 2004 through April of 2006, HAB maintained an office at 1270 E. 12th Street in Dubuque, Iowa ("Iowa office"). (Pl. 56.1 Resp. ¶ 2.) HAB's Iowa office was in the upper level of a building that also housed a company called Quad Cities Thermo-King ("Thermo-King"). (Pl. 56.1 Resp. ¶ 3.)

### I.     Todd Avery's Position with HAB

HAB leased its employees through Complete Personnel Logistics, a division of Minuteman Temporary Services ("Complete Personnel"). (Pl. 56.1 Resp. ¶ 5.) Complete Personnel is located in Chicago, Illinois. (Pl. 56.1 Resp. ¶¶ 4-5.) Todd Avery ("Avery") was employed by Complete Personnel and served as General Manager of HAB from approximately January of 2004 through May of 2006. (Pl. 56.1 Resp. ¶ 6.) Since HAB's inception in 2003, Avery has been a minority owner of the company. (Pl. 56.1 Resp. ¶ 7.) During the events at issue here, Avery worked in HAB's Iowa office on weekdays, although he lived in Elizabeth, Illinois. (Pl. 56.1 Resp. ¶ 8; Def. 56.1 Resp. ¶ 1.) While Avery would spend a day on each weekend working in HAB's Willow Spring, Illinois

---

[2]Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Fact as follows: citations to the Arrow Defendants' Statement of Uncontested Material Facts have been abbreviated to "Def. 56.1 Ex.___."; citations to HAB's Additional Statement of Undisputed Material Facts have been abbreviated to "Pl. 56.1 Ex.___."; citations to HAB's Response to the Arrow Defendants' Rule 56.1(a) Statement of Undisputed Material Facts have been abbreviated to "Pl. 56.1 Resp. ¶ ___."; citations to the Arrow Defendants' Response to HAB's Additional Statement of Undisputed Material Facts have been abbreviated to "Def. 56.1 Resp. ¶ ___."

office, the Iowa office was Avery's main place of employment and he spent the vast majority of his time working there. (Pl. 56.1 Resp. ¶ 9; Def. 56.1 Resp. ¶ 1.)

## II. Avery's Initial Contact with Arrow

On April 7, 2004, Avery traveled to Kansas City, Missouri to meet with representatives of K.C. Crane, a Missouri used truck seller. (Pl. 56.1 Resp. ¶ 10.) While there, he personally inspected and test-drove three trucks. (Pl. 56.1 Resp. ¶ 11.) Although not material here, the parties dispute whether the three trucks Avery test-drove were among the twenty trucks that HAB ultimately purchased from Arrow and the trucks at issue here ("the trucks"). (Def. 56.1 Ex. C at 150:16-151:4, 158:23-159:5.; Pl. 56.1 Resp. ¶ 11.) After leaving Kansas City, Avery spoke with Rick Krueger ("Krueger") and John Dietrich ("Dietrich") of Thermo-King about his visit to Kansas City. (Pl. 56.1 Resp. ¶ 12.) On April 9, 2004, Avery drove to Thermo-King's office in Milan, Illinois and, with Dietrich and Krueger, contacted Arrow's employee and Defendant here, Scott Taylor, in Kansas City, Missouri by telephone to inquire about HAB's potential purchase of the trucks. (Pl. 56.1 Resp. ¶ 14.)[3] A few days later, on April 13, 2004, Avery and Taylor spoke by telephone and Avery told Taylor, who was located in Kansas City, that HAB had decided to purchase the trucks. (Pl. 56.1 Resp. ¶ 15; Compl. ¶ 33.) The parties dispute whether Avery was in Iowa or Illinois during this conversation. (Def. 56.1 Ex. D ¶ 15; Pl. 56.1 Resp. ¶ 15.) Avery was the only person who ever negotiated with Arrow on behalf of HAB about HAB's purchase of the trucks. (Pl. 56.1 Resp. ¶ 16.)

---

[3] Although the Arrow Defendants contend that the April 9, 2004 call took place in Davenport, Iowa, (*see* Def. 56.1 Ex. B at 104:9-105:7.), it is clear from the record that Avery was using the term "Davenport" as a reference to the Davenport metro area, of which Milan, Illinois is a part. Avery testified at another point in his deposition that Dietrich's Thermo-King office was in Milan, Illinois, not in Iowa. (Pl. 56.1 Ex. 2 at 155:19-157:11; Ex. 3 ¶¶ 10-12).) Even if the Court were to resolve this issue in the Arrow Defendants' favor, however, it would not change the outcome.

3

He was also the only HAB representative who ever dealt with Arrow about any issues relating to the condition of the trucks after HAB purchased them. (Pl. 56.1 Resp. ¶ 23.)

**III.    The trucks**

The trucks HAB agreed to purchase were originally owed by PAM Transport, Inc. ("PAM"). (Pl. 56.1 Resp. ¶ 29.) PAM had purchased the trucks from Mack when the trucks were brand new. (Pl. 56.1 Resp. ¶ 29.) In that transaction, the trucks had been delivered to PAM in Tontitown, Arkansas. (Pl. 56.1 Resp. ¶ 30.) In late Summer of 2003, PAM transferred title to the trucks back to Mack, and Mack registered the trucks in the State of Pennsylvania. (Pl. 56.1 Resp. ¶ 31.) From late Summer of 2003 until approximately February of 2004, the trucks were stored at a Mack dealership in Arkansas. (Pl. 56.1 Resp. ¶ 32.) In February of 2004, after Arrow purchased the trucks from Mack, Mack transferred title to the trucks to Arrow and they were brought to Arrow's facility in Kansas City, Missouri. (Pl. 56.1 Resp. ¶¶ 33-34.)

At HAB's specific request, Arrow delivered each of the trucks from Kansas City to Thermo King's facility in Dubuque, Iowa. (Pl. 56.1 Resp. ¶ 17.) Arrow delivered the trucks in separate groups, with the first two trucks being delivered on May 12, 2004. (Pl. 56.1 Resp. ¶ 18.) Arrow delivered the rest of the trucks between May and August of 2004. (Pl. 56.1 Resp. ¶ 18.) Upon Arrow's sale of the trucks to HAB, Arrow transferred the trucks' titles to HAB and listed HAB's Dubuque, Iowa address on the titles. (Pl. 56.1 Resp. ¶ 35.) HAB subsequently registered the trucks in Iowa and obtained Iowa titles for each of them. (Pl. 56.1 Resp. ¶ 36.) HAB registered the trucks in Iowa because, according to Avery, "[t]hat's where they [the trucks] were domiciled mostly" and because "[i]t's a little bit less expensive in taxes" than in Illinois. (Pl. 56.1 Resp. ¶ 37.)

Thermo-King inspected each Truck upon its delivery to Thermo-King's facility in Iowa. (Pl. 56.1 Resp. ¶ 19.) Based on the inspection, HAB and Thermo-King discovered that Arrow had allegedly misrepresented the condition of the trucks. (Pl. 56.1 Resp. ¶ 20.) At Avery's request, Defendant Rick Moore, another Arrow employee, sent a copy of the trade terms relating to HAB's purchase of the trucks to HAB at its Iowa office. (Pl. 56.1 Resp. ¶ 21.)

Through Avery, HAB repeatedly spoke to Taylor and Moore, who were located in Kansas City, about the trucks, HAB's purchase of the trucks, the delivery of the trucks to Thermo-King in Iowa, and certain alleged mechanical problems with the trucks. (Pl. 56.1 Resp. ¶ 22.) Avery and Thermo-King representatives contacted Arrow in Kansas City from Thermo-King's Iowa facility on several occasions to discuss the alleged mechanical problems with the trucks. (Pl. 56.1 Resp. ¶ 24.) For example, Avery and a representative from Thermo-King in Iowa called Taylor on May 24, 2004 and spoke to him about the alleged mechanical problems with the trucks that had been delivered to Thermo-King's Iowa facility. (Pl. 56.1 Resp. ¶ 25.) During that conversation, Arrow agreed to pay for certain repairs to some of the trucks. (Pl. 56.1 Resp. ¶ 26.) These repairs were to be done by Thermo-King at Thermo-King's facility in Iowa. (Pl. 56.1 Resp. ¶¶ 26-27.) Arrow sent checks to Thermo-King in Iowa for these repairs. (Pl. 56.1 Resp. ¶ 28.)

In August or September of 2004, Avery traveled to Kansas City and attended a meeting in Arrow's offices with Taylor, Moore, and another representative of Arrow. (Pl. 56.1 Resp. ¶ 38.) Avery requested the meeting for the purpose of discussing the repair costs HAB had allegedly incurred for the trucks. (Pl. 56.1 Resp. ¶ 38.) On September 30, 2004, Avery and two representatives of Thermo-King met with two Mack representatives at Thermo-King's Iowa facility to discuss the problems HAB had allegedly experienced with the trucks. (Pl. 56.1 Resp. ¶ 39.)

## IV. HAB's Allegations

HAB alleges that the Arrow Defendants violated the Consumer Fraud Act by making misrepresentations to HAB during the following conversations: (1) Avery's conversation with Taylor when both were in Kansas City on April 7, 2004, during which Taylor allegedly told Avery that the trucks in which HAB was interested were coming directly out of PAM's fleet , (Pl. 56.1 Resp. ¶ 51; Compl. ¶ 81(a).); (2) the April 9, 2004 telephone conversation between Taylor, Avery, and the Thermo-King representatives, discussed above, during which HAB alleges Taylor made a number of material misrepresentations, including a statement about warranty coverage and the assurance that the trucks would comply with Department of Transportation standards ("DOT compliant") upon delivery, (Pl. 56.1 Resp. ¶¶ 41, 52; Compl. ¶ 81(b-c).); (3) a telephone conversation "[a] few days after May 14, 2004," during which Taylor allegedly called HAB to verify that the remaining eighteen trucks would be repaired, inspected, and made DOT compliant before being delivered, (Pl. 56.1 Resp. ¶ 45; Compl. ¶ 43.); (4) a telephone conversation on May 18, 2004 between Avery and Taylor, during which Taylor allegedly called Avery and told him that the next six trucks to be delivered had been DOT inspected and repaired, (Pl. 56.1 Resp. ¶ 47; Compl. ¶¶ 44-45.); (5) a telephone conversation on May 24, 2004, during which Taylor allegedly told Avery not to worry about the problems with the first ten trucks and that Arrow would take care of HAB by ensuring compliance on the second set of trucks (Pl. 56.1 Resp. ¶ 54; Compl. ¶ 81(d).); (6) a telephone conversation "shortly after May 24, 2004," between Avery and Moore, during which Moore allegedly introduced himself to Avery and asked when HAB would accept the second-set of ten trucks, (Pl. 56.1 Resp. ¶ 49; Compl. ¶ 50.); (7) a telephone conversation on May 31, 2004, during which Moore allegedly told Avery that Arrow would pay for all repairs on the trucks, (Pl. 56.1 Resp.

6

¶ 56; Compl. ¶ 85(a).); and (8) a telephone conversation on June 18, 2004, during which Moore allegedly told Avery that each of the trucks would be DOT compliant and that the components and accessories would be in good working order. (Pl. 56.1 Resp. ¶ 58; Compl. ¶ 85(b).) HAB alleges it relied on the representations allegedly made by Taylor during the April 9, 2004 telephone call that Avery, on behalf of HAB, offered to purchase the trucks on April 13, 2004. (Pl. 56.1 Resp. ¶ 43.) HAB also alleges that it relied on the representations allegedly made by Moore during the May 31, 2004, and June 18, 2004 conversations that Avery, on behalf of HAB, agreed to accept the second set of ten trucks from Arrow. (Compl. ¶ 88.)

During each of these telephone conversations, Taylor and Moore were located in Kansas City, Missouri. (Pl. 56.1 Resp. ¶¶ 42, 44, 46, 48, 50, 53, 55, 57, 59.) The parties agree that Avery spoke to Taylor from his Iowa office, but dispute whether he made and received "most" of his phone calls to and from Taylor from his Iowa office. (Def. 56.1 Ex. B at 105:19-23; Pl. 56.1 Ex. 3 ¶ 28.) HAB contends that "[o]n several occasions," Avery spoke to Taylor and Moore from his cell phone while he was working in Willow Springs or Elizabeth, Illinois. (Pl. 56.1 Ex. 3 ¶ 28.) At no time did any employee or representative of Arrow ever meet with Avery or with any other employee or representative of HAB in Illinois. (Pl. 56.1 Resp. ¶ 63.) At no time did any employee or representative of Arrow ever make any telephone call from Illinois to Avery or to any other employee or representative of HAB. (Pl. 56.1 Resp. ¶ 64.) At no time did any employee or representative of Arrow who worked in Illinois ever meet or speak with Avery or with any other employee or representative of HAB. (Pl. 56.1 Resp. ¶ 65.)

**STANDARD OF REVIEW**

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court, however, will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chi. Sch. Reform Bd. Of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

**DISCUSSION**

The Arrow Defendants move for summary judgment on Count II of HAB's Complaint, arguing that the Consumer Fraud Act does not apply to the alleged fraud because it did not occur primarily and substantially in Illinois. Section 2 of the Consumer Fraud Act prohibits unfair or deceptive acts or practices, including the use of "deception, fraud, false pretense, false promise,

misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact . . . in the conduct of any trade or commerce." 815 ILCS 505/2. Section 10a(a) of the Act authorizes private causes of action for practices deemed in violation of Section 2. *See* 815 ILCS 505/10a(a). To prove a violation of the Act, a plaintiff must show: (1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce; (4) defendant's conduct was a proximate cause of injury; and (5) actual damages to plaintiff. *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 149 (2002).

The Consumer Fraud Act does not apply to fraudulent practices that take place outside Illinois. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853 (2005); *Landau v. CNA Fin. Corp.*, 886 N.E.2d 405, 406 (1st Dist. 2008) ("The Consumer Fraud Act is a statute without extraterritorial effect . . . ."). Rather, a plaintiff may only pursue a claim under the Consumer Fraud Act "if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." *Id*. at 853-54. Each case must be decided on its own facts; "there is no single formula or bright-line test for determining whether a transaction occurs within [Illinois]." *Id*. at 854. "The place of injury or deception is only one of the circumstances that make up a fraudulent transaction . . . ." *Id*. at 853. In determining whether the transaction occurred primarily and substantially in Illinois, the Court considers factors such as "the place of injury or deception, the location of the parties, the location where the relevant activities occurred, and the parties' contacts with Illinois." *Valley Air Serv. v. Southaire, Inc.*, No. 06 C 782, 2009 WL 1033556, at *12 (N.D. Ill. Apr. 16, 2009) (Manning, J.) (citing *Avery*, 835 N.E.2d at 853-855); *see also*, *e.g.*, *The Clearing Corp. v. Fin. and*

*Energy Exchange Ltd.*, No. 09 C 5383, 2010 WL 2836717, at *6 (N.D. Ill. July 16, 2010) (Zagel, J.) (noting that the court in *Avery* considered the following factors: (1) the plaintiff's residence; (2) the defendant's place of business; (3) the location of the item that was the subject of the transaction; (4) the location of the plaintiff's contacts with the defendant; (5) where the contracts were executed; (6) the contracts' choice of law provision, if any; (7) where the deceptive statements were made; (8) where payments for services were sent; and (9) where complaints were to be directed).

Here, the circumstances relating to the transaction at issue—HAB's purchase and continued acceptance of the trucks—have some connection to Illinois. HAB is an Illinois corporation and its employee, Avery, is an Illinois resident. HAB leased its employees, including Avery, from a company located in Illinois. HAB alleges that as a result of the Arrow Defendants' misrepresentations, it felt injury in Illinois. Further, although not an Illinois corporation, Arrow is licensed to do business in Illinois. Finally, on April 9, 2004, when Avery initially contacted Taylor and, according to HAB, Taylor made the misrepresentations that led HAB to purchase the trucks, Avery was located in Milan, Illinois.

Nevertheless, the overwhelming majority of the circumstances relating to the transaction took place outside Illinois. Taylor and Moore, the Arrow employees who allegedly made the misrepresentations, were located in Kansas City, Missouri during every one of the parties' telephone conversations, including the April 9, 2004 conversation. Taylor and Moore were negotiating with Avery, who worked in HAB's Iowa office. HAB's Iowa office was Avery's main place of employment and it was where he worked on weekdays. On April 7, 2004, in Kansas City, Missouri, Avery test-drove three Mack trucks that were, at the very least, of the same make and model as the twenty trucks HAB ultimately purchased from Arrow. The trucks at issue here never entered Illinois,

nor did they have any connection to Illinois. The trucks, which Arrow purchased from Mack and later sold to HAB, were stored in Arkansas, were transferred to Kansas City, Missouri, and were then delivered and accepted at HAB's office in Iowa. The trucks were licensed in Iowa and had HAB's Iowa address on the title. Additionally, HAB inspected the trucks in Iowa and it was in Iowa that HAB discovered that the Arrow Defendants had allegedly misrepresented the condition of the trucks.

Once HAB discovered that the trucks did not meet its expectations, at Avery's request, Taylor sent the parties' agreed trade terms to HAB's Iowa office. HAB had Thermo-King make the necessary repairs to the trucks in Iowa, and Arrow sent the checks for the repairs to HAB's Iowa office. Avery traveled to Kansas City, Missouri to meet with the Arrow Defendants about the allegedly deficient trucks. Finally, Avery met with Mack's representatives at HAB's Iowa office to discuss HAB's problems with the trucks. No Arrow representatives in Illinois ever called HAB nor were they involved in discussions about the purchase or repair of the trucks.

HAB does not contest the fact that all of these circumstances relating to the transaction occurred outside of Illinois. Instead, HAB argues that the Court cannot grant summary judgment because there is a disputed issue of fact about where Avery was located during some of his phone conversations with the Arrow Defendants. First, the Court takes judicial notice of the fact that all of the telephone conversations at issue here—at least the ones for which the parties have provided exact dates—took place on weekdays. *See* Fed. R. Civ. P. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination to resort to sources whose accuracy cannot reasonably be questioned."). As it is undisputed that Avery worked in HAB's Iowa office on Mondays through Fridays, that the Iowa office was Avery's "main place of employment[,]" and that he spent "the vast majority of [his] time" at the Iowa office,

11

HAB's contention that the majority of the conversations about the trucks may not have taken place in Iowa lacks support in the record.

Even if some communications were made by Avery from Illinois, that would not prevent the Court from granting summary judgment if the facts and circumstances show that the alleged fraud took place primarily and substantially outside of Illinois. *See*, *e.g.*, *Valley Air Service*, 2009 WL 1033556, at *12-13 (granting summary judgment in favor of the defendant on the plaintiff's Consumer Fraud Act claim despite the fact that the plaintiff was an Illinois citizen, felt injury in Illinois, and communicated with the defendant from Illinois because "the bulk of the circumstances making up the allegedly fraudulent transaction" occurred outside Illinois). The Court finds that even taking the facts in the light most favorable to HAB and accepting that, in addition to the April 9, 2004 call, Avery may have been on his cell phone in Illinois instead of in his Iowa office during at least one other key conversation, the circumstances relating to the alleged fraud did not take place "primarily and substantially" in Illinois. *Avery*, at 853-54; *see*, *e.g.*, *Valley Air Service*, 2009 WL 1033556, at *12-13; *Walker v. S.W.I.F.T. SCRL*, 491 F. Supp. 2d 781, 795 (N.D. Ill. 2007) (dismissing the plaintiff's Consumer Fraud Act Claim where "the only connection to the state of Illinois [wa]s the fact that [the plaintiff] is a resident of Illinois" and stating that "[w]hile this is one factor to consider, the court finds no substantial connection to Illinois on the face of the Second Amended Complaint"); *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 775 (N.D. Ill. 2008) (dismissing the plaintiffs' Consumer Fraud Act claim despite the fact that each was an Illinois resident and "conduct[ed] substantial business in th[e] state" because there were no "allegations that plausibly suggested that the [deceptive act] occurred primarily and substantially in Illinois"). For

those reasons, the Court grants the Arrow Defendants' Motion for Summary Judgment on Count II of HAB's Complaint.

## **CONCLUSION AND ORDER**

For the reasons set forth above, the Court grants the Arrow Defendants' Motion for Summary Judgment on Count II of HAB's Complaint.

_____
Virginia M. Kendall
United States District Judge
Northern District of Illinois

Date: January 25, 2011